U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 25 2011

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

## United States District Court

## For The Northern District of Texas

## Dallas

Plaintiff: Travelhost

Civil Action NO. 3:11-CV-0455-D

Vs.

Defendant: Tonya Figg

And Figg Publishing

# Counter- Claim by Defendant

Defendant, Tonya Figg and Figg Publishing, hereby files this counter- claim to the complaint filed by Plaintiff on March 4th, 2011.  Defendant alleges the following:

1)   **Travelhost failed to comply with Indiana law in accordance with the State of Indiana code to transact or sell a business in the State of Indiana according to code 24-5-8.  Seller failed to disclose several required disclosures according to Indiana Law including registering with the State of Indiana, filing the proper filing fees and posting bond.  Many of these codes have been violated as evidenced by the attached lawsuits against Travelhost within the last seven years that were not disclosed at the time of purchase by defendant.  Indiana law also states in IC24-5-8-15 that if seller has not complied with Indiana law, investor may cancel the contract *at any time in any manner*.**

   Chapter 8. Business Opportunity Transactions, which is attached, specifically and most importantly but not limited to many others, section 2.  A complaint has been filed with the State of Indiana in reference to this matter, see addendum 1.

**IC 24-5-8-15**
**Cancellation of contract for seller's failure to comply**
   Sec. 15. If a seller fails to comply with section 2 of this chapter, the investor may cancel any

contract by notifying the seller in any manner.
*As added by P.L.134-1984, SEC.1.*

**IC**                                                                 **24-5-8-2**
**Disclosure**         **document;**         **cover**         **sheet;**         **contents**
Sec. 2. (a) At least seventy-two (72) hours before the time the investor signs a contract, or at least seventy-two (72) hours before receipt of any consideration by the seller, whichever occurs first, the seller shall provide the investor a written disclosure document, the

cover sheet of which is entitled in at least ten (10) point bold face capital letters "DISCLOSURES REQUIRED BY INDIANA LAW". Under this title, the following statement must appear in at least ten (10) point type: "The state of Indiana has not reviewed and does not approve, recommend, endorse, or sponsor any business opportunity. The information contained in this disclosure has not been verified by the state. If you have any questions about this investment, see an attorney before you sign a contract.". Nothing except the title and statement may appear on the cover sheet.
    (b) The disclosure document must also contain the following information:
        (1) The name of the seller, whether the seller is doing business as an individual, partnership, limited liability company, or corporation, the names under which the seller has done, is doing, or intends to do business, and the name of any parent or affiliated company that will engage in business transactions with the investor or that will take responsibility for statements made by the seller.
        (2) The names, business addresses, business telephone numbers, and titles of the seller's officers, directors, trustees, general partners, general managers, principal executives, and any other persons charged with responsibility for the seller's business activities relating to the sale of business opportunities.
        (3) The names, business addresses, and business telephone numbers of all the seller's representatives who are soliciting business opportunities in Indiana.
        (4) The length of time the seller has:
            (A) solicited business opportunities; and
            (B) solicited business opportunities involving the goods or services currently being offered to the investor.
        (5) A statement of the initial payment to be paid by the investor, or when not known, a statement of the approximate initial payment to be paid.
        (6) An unexecuted copy of all contracts.
        (7) The following financial statements:
            (A) A balance sheet of the seller as of the close of its last fiscal year.
            (B) Income statements for each of the seller's last three (3) fiscal years or for the period of the seller's and any predecessor's existence, if the seller and any predecessor have been in existence for less than three (3) years.
        (8) A complete and detailed description of any service that the seller undertakes to perform for the investor.
        (9) A complete description of any training offered by the seller, the length of training, and a detailed itemization of all costs to be covered by any fee to be charged for the training.

(10) A statement disclosing the names, home addresses, and home telephone numbers of all persons who have been investors in a business opportunity offered by the seller within the last two (2) year period.

(11) A statement listing the name, home address, and home telephone number of any investor who has requested within the preceding three (3) year period that the seller return his money.

(12) A statement as to whether the seller or any of its officers, directors, trustees, general partners, general managers, principal executives, or representatives has been:
    (A) held liable in a civil action for unfair, false, misleading, or deceptive practices;
    (B) convicted of a crime involving fraud, embezzlement, conversion, or theft during the most recent seven (7) year period; or
    (C) declared bankrupt in any judicial proceeding during the most recent seven (7) year period.

(13) A statement as to whether the seller or any of its officers, directors, trustees, general partners, general managers, principal executives, or representatives has been a party to any legal cause of action brought by an investor within the most recent seven (7) year period.

(14) A statement as to whether the seller or any of its officers, directors, trustees, general partners, general managers, principal executives, or representatives is currently involved in litigation alleging unfair, false, misleading, or deceptive practices.

(15) A statement containing the name of the parties, the name of the court, the cause or docket number of the lawsuit, the date the suit was filed, and the date the judgment was entered, if applicable, for each answer to subdivisions (12), (13), and (14).

(16) The following statement: "As required by Indiana law, the seller has secured a bond issued by _____ (name and address of surety), a surety company authorized to do business in Indiana. Before signing a contract to invest in this business opportunity, you should check with the surety company to determine the bond's current status.".

(17) If the seller makes any statement concerning earnings or range of earnings that may be earned through the business opportunity, the seller must set forth the following:
    "No guarantee of earnings or ranges of earnings can be made. The number of investors who have earned through this business opportunity an amount in excess of the amount of their initial payment is at least _____, which represents _____ percent of the total number of investors in this business opportunity.".
*As added by P.L.134-1984, SEC.1. Amended by P.L.8-1993, SEC.362.*

**IC**                                                              **24-5-8-3**
**Surety**                            **bonds;**                                **requirements;**                      **waiver**
Sec. 3. (a) A seller shall obtain a surety bond issued by a surety company authorized to do business in Indiana. The amount of the bond must be at least twenty (20) times the initial payment required for the business opportunity, but not less than seventy-five thousand dollars ($75,000). The bond must be in favor of the state for the use and benefit of investors.

(b) The attorney general may waive the bonding requirement under subsection (a) and accept in lieu of the bond an irrevocable letter of credit for an equivalent amount issued in the favor of

the                                                                                                          state.
*As added by P.L.134-1984, SEC.1. Amended by P.L.12-1986, SEC.11.*

**IC**                                                                                                    **24-5-8-4**
**Requirements before advertising; amendment of filings; renewal fee; record of filings**
    Sec. 4. (a) Before placing any advertisement or making any other representations to any
investor          in          Indiana,          the          seller          shall:
    (1) file a copy of the disclosure statement required by section 2 of this chapter and the bond
required by section 3 of this chapter with the consumer protection division of the office of the
attorney                                  general;                                  and
    (2)      pay      an      initial      filing      fee      of      fifty      dollars      ($50).
    (b) The seller shall amend these filings when any material change in the information occurs
and      shall      pay      a      fee      of      ten      dollars      ($10)      for      filing      the      amendment.
    (c) If the seller continues to solicit business opportunities in Indiana, he shall pay annually a
renewal fee of ten dollars ($10) on or before the anniversary date of the initial filing for the
particular                                business                                opportunity.
    (d) The director of the consumer protection division of the office of the attorney general or his
designate shall maintain a record of all filings made under this chapter and shall assign a
registration number to each of them. The seller shall be advised in writing of the assigned
number. Any advertisements, pamphlets, brochures, or any other materials used in the
solicitation of a business opportunity must include the assigned registration number in the
following          manner:          "C.P.D.          Reg.          No.          _____          .".
*As added by P.L.134-1984, SEC.1.*


**2)   When advertising Travelhost represented itself as a franchise (see addendum
2) and failed to follow proper franchise laws when selling business in Indiana
and has sold at least five business transactions in the state of Indiana in a 24
month period.  According to the FTC as documented by FTC Ruling attached,
Travelhost is a known habitual offender of the FTC Ruling, see attached
sample of Travelhost Ad on "Today's Best Franchises" as Addendum 2.**


# Dealerships and Distributorships – Beware the Franchise Minefield


**by Leonard D. Vines**[1]
Franchise laws embrace a wide variety of business distribution arrangements including many
relationships that are not traditionally viewed as franchises. Even sophisticated parties often
overlook their applicability and can suffer dire consequences as a result. The name given to the
relationship is not controlling, and the protections afforded by the state and federal franchise
laws cannot be waived. Business attorneys should be aware of the elements of a franchise under
the franchise laws so they can structure the business relationship accordingly.

*"Legal terms often have specialized meanings that can surprise even a sophisticated party. The term 'franchise,' or its derivative 'franchisee', is one of those words."[2]*

Manufacturers and suppliers are all too often surprised and dismayed to learn that their distributorship relationships are subject to the franchise laws. A striking example is a recent case in which a jury awarded $1.525 million to a terminated Mitsubishi forklift distributor due to a violation of the Illinois franchise law. In affirming, the Court of Appeals poignantly noted:

Like many manufacturers, MCFA (Mitsubishi) simply did not appreciate how vigorously Illinois law protects "franchisees." . . . While we understand MCFA's concern that dealerships in Illinois are too easily categorized as statutory franchisees, that is a concern appropriately raised to either the Illinois legislature or Illinois Attorney General, not to this court. [3]

Likewise, attorneys representing manufacturers and suppliers, as well as those representing a terminated or disgruntled distributor, do their clients a grave disservice if they fail to recognize the applicability of the franchise or related laws.[4] For example, in *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin,*[5] attorneys representing a marketer of health and fitness business opportunities were sued for malpractice for failing to advise a client that it was subject to the Connecticut business opportunity law. In *Pyramid Controls Inc. v. Siemens Indus. Automation, Inc.,*[6] an attorney missed the statute of limitations for a terminated dealer because the attorney failed to recognize that the relationship was protected under the Illinois franchise law. In that case, the Seventh Circuit rejected plaintiff's argument that "only the plaintiff's actual knowledge can trigger the statute of limitations because the Franchise Act is so complicated and obscure very few attorneys understand how it works or even know of its existence."[7]

Indeed, few lawyers comprehend the breadth and scope of the franchise laws, and many fail to understand that the franchise laws, along with related laws, govern business relationships that may be vastly different from what is typically thought of as a franchise.[8]

**What is a Franchise?**

Unfortunately, there is no universal definition of what constitutes a franchise. Definitions and interpretations under both federal and state law may be applicable, depending on the situation.

*Federal Law.* The Federal Trade Commission Act, in a promulgation known as the "FTC Rule,"[9] defines a franchise as a "continuing commercial relationship" that contains the following three elements:

1. *Trademark.* The franchisee is allowed to offer, sell or distribute goods, commodities, or services that are identified by a trademark, service mark, trade name, advertising or other commercial symbol;
2. *Significant control or assistance.* The franchisor exerts significant control or assistance over the franchisee's method of operation; and
3. *Fee or Payment.* The franchisee is required to pay a fee to the franchisor of $500 or more at any time (other than for bona fide wholesale prices for inventory) before or within six months after commencing operations of the business.[10]

*State Laws.* Although definitions employed by the states often resemble those set forth in the FTC rule insofar as state definitions usually involve a trademark element, a marketing element and a payment element, state laws may be narrower or broader than the FTC rule and often extend to forms of business relationships that embrace a wide variety of dealerships, distributorships, and licensing arrangements. Under most state laws the essential statutory definition for a *franchise* falls within one of two categories:

(1) *Marketing Plan.* The franchisor grants the franchisee the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by the franchisor; the business operated is substantially associated with the franchisor's trademarks, trade name, or commercial symbols; and the franchisee must pay a direct or indirect fee. The marketing plan element is often satisfied if the franchisor provides the franchisee with advice regarding business operations and sales of the franchisor's product or service.

(2) *Community of Interest.* The franchisor grants the franchisee the right to engage in the business of offering or distributing goods or services using the franchisor's trade name or marks, the parties share a community of interest in the marketing of the goods or services, and the franchisee pays a fee. The community of interest element is often satisfied when there is a continuing financial interest between the parties in the operation of the franchisee's business or the sale of the franchisor's products.[11]

## Laws Governing Franchises

If the statutory definitional elements of a franchise are satisfied, the name attached to the relationship by the parties is irrelevant. The protections afforded by the laws generally cannot be waived, and the benefits of the applicable statute will control, despite contractual language to the contrary.

Once a business relationship falls within the statutory definition of a franchise, a variety of laws and regulations come into play. While a number of these franchise or related laws have their own particular nuances, they generally cover the following areas:

*Franchise pre-sale disclosure requirements and registration.* If a relationship meets the definition of a franchise under the FTC rule, the franchisor is required to provide a comprehensive pre-sale document (often referred to as an offering circular) to a prospective purchaser.[12] The disclosure requirement applies in all 50 states. While the FTC rule contains no pre-sale registration requirement, the following states require the franchisor to register with a state agency before a franchise can be offered for sale: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Oregon, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin. In addition, the following states – while not technically considered franchise registration states – also require a filing with a state agency in order to obtain an exemption under the state's business opportunity law: Florida, Kentucky, Nebraska, North Carolina, Texas, and Utah.

*Special Industry Laws.* A wide variety of special industries are subject to specific state statutes that govern the relationship between the manufacturer or supplier and the distributor or dealer. The laws offer varying degrees of statutory protection. Common types of distribution arrangements subject to special protections include: liquor, motor vehicle, farm equipment, petroleum, and outdoor power equipment dealerships.

*Relationship Laws.* If a business relationship meets the definition of a franchise under a particular state law, many of the substantive aspects of the business relationship (i.e., termination, transfer, cancellation, and non-renewal) will be governed by that state law. The FTC rule does not regulate the relationship between the franchisor and franchisee after the franchise is purchased. State laws are, however, designed to protect franchisees from being terminated without good cause and, to varying degrees, from being treated unfairly. Each state law is different, so it is important to examine the applicable statute. States that have enacted relationship laws are Arkansas, California, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, South Dakota, Virginia, Washington, Wisconsin.

Not all laws apply to each situation. For example, a relationship may be subject to laws governing termination, even if it is not subject to federal disclosure requirements. However, a relationship which is a franchise under the FTC rule will most likely be subject to a state's relationship laws.

Many state franchise laws, as well as the FTC rule, contain several exclusions and exemptions; however, the exclusions and exemptions are by no means uniform. Among those relationships exempt from coverage under the FTC rule are the fractional franchise,[13] employer-employee relationships, and general partnerships. State exemptions vary widely. An exemption available under the FTC rule may not be sufficient to exempt a relationship from coverage under a state law.

## Business Opportunity Laws

Dealers and distributors, particularly those who attempt to structure the relationship in an effort to avoid the application of the franchise law, must pay particular attention to business opportunity laws. The FTC rule defines a business opportunity as a relationship in which: (a) the investor sells goods or services supplied by the seller or its affiliate, or by suppliers with which the seller requires the investor to do business; (b) the seller secures retail outlets or accounts for the goods or services, or secures locations for vending racks or machines, or provides the services of someone who can perform either of these functions; and (c) the investor must make a required payment to the seller or its affiliate of $500 or more from any time before to within six months after commencing operations in order to obtain or commence the venture.[14]

State business opportunity laws generally cover a much broader range of business arrangements than those covered by the FTC rule. These laws literally apply to franchises; however, in most cases, there is an exemption or exclusion available to a franchise if it is associated with a trademark or tradename or if the franchise is subject to the FTC rule. The following states have enacted business opportunity laws: Alabama, California, Connecticut, Florida, Georgia, Illinois,

Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, North Carolina, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and Washington.

## Examples of "Hidden" Franchises

The wide array of cases and administrative opinions interpreting whether or not the statutory definition of a franchise is present demonstrates that there are many hidden franchises. The following cases provide just a few examples of the wide grasp of the franchise laws and their applicability to distributorship and other similar arrangements. To the untrained eye, many of these situations do not appear to involve a franchise. They have been variously referred to as hidden, inadvertent, or unintended franchises.



## Risks of Non-Compliance

Failure to comply with franchise registration or relationship laws exposes the violator to substantial risks of civil and criminal liability. Although "there is no private right of action" for failure to comply with the FTC rule,[33] the Federal Trade Commission has enforcement powers to subject the non-complying party and its officers and directors to injunctions, cease and desist orders, rescission, civil fines, and criminal penalties. Private causes of action are, however, available under many state laws. Those who fail to register or provide required disclosures in the so-called "registration states" are subject to various civil remedies, such as damages, rescission, and attorney's fees, and, in most cases, criminal liability. Furthermore, some states that do not require franchisors to register have enacted *Little FTC Acts* that provide that a violation of the FTC rule is actionable under state law. The FTC rule imposes liability on officers and directors if there is a violation, and most state laws extend joint and several liability to officers and directors and those participating in the violation as well.

Franchisors who fail to follow the mandates of state relationship laws, particularly those governing termination or failure to renew, are subject to injunctive relief and significant damages for wrongful termination. For example, in *Globe Distributors v. Adolph Coors Co.,*[34] a New Hampshire beer manufacturer relied on the language in the distributorship agreement, which allowed for termination for nonpayment without any demand or notice, to its peril. Its distributor was awarded double damages of more than $10.2 million, plus attorney's fees, because the brewer failed to comply with the state statute requiring the brewer to give written notice of an intent to terminate and an opportunity to cure the claimed deficiency.

## 3) TRAVELHOST failed to meet section 5 of Business Opportunity Law in Indiana.

IC                                                                                      24-5-8-5

**Representations   of   business   opportunity;   copy   to   investor,   contents**

Sec. 5. (a) If the seller represents that the business opportunity provides earning potential of any kind, the seller shall have data to substantiate the claims of earning potential and shall give to the investor at the first in person communication by the seller a copy of this data or a copy of any statement of estimated or projected earning potential prepared for presentation to prospective investors, together with an explanation of the statement. A mathematical computation of the number of sales multiplied by the amount of profit per sale to reach a projected earnings figure is not sufficient data to substantiate an earnings potential claim for the purposes of this section.

(b) The earning potential data given to the investor by a seller, except a substantial seller, must disclose:

(1) the length of time the seller has been soliciting the particular business opportunity;

(2) the number of investors in the particular business opportunity that were solicited by the seller and known to the seller to have made at least the same sales, earnings, or profits as those represented;

(3) the percentage the number in subdivision (2) represents of the total number of investors in   the   particular   business   opportunity   that   were   solicited   by   the   seller;   and

(4) the current address of any person named by the seller as having profited from the particular business opportunity, a description of the circumstances under which the profit was earned, and a description of any interest held by the named person in the business opportunity being                  offered                  to                  the                  investor.

*As added by P.L.134-1984, SEC.1. Amended by P.L.252-1987, SEC.3.*

■ **Plaintiff under contract with Defendant agreed to be Publisher.   The publication came out numerous times with typos and errors throughout the magazine and very poor quality printing, design and layout.   Plaintiff was notified the first time of breach of contract by Plaintiff from Defendant on November 20th, 2008 after first issue (see addendum 3 ).   Plaintiff did nothing to remedy breach of contract.   Plaintiff was notified several times in between of the breach of contract between November 20th, 2008 and December 21st, 2009 when the final notice was given to Plaintiff by email by Defendant that Contract was cancelled.   Plaintiff was contractually obligated to be the "Publisher" for Defendant.   Plaintiff breached the contract on many occasions to perform the duties of Publisher excluding those listed expressly as duties of Associate Publisher in contract as duties of Associate Publisher.   Defendant**

**lost on several occasions many customers because of the "copy editing" performed by Plaintiff, "Publisher" and the poor quality of the printing, layout and design by Plaintiff as evidenced by first notification of "Breach of Contract" by Plaintiff.** Publishing according to wikipedia: *Publishing includes: the stages of the development, acquisition, copyediting, graphic design, production – printing (and its electronic equivalents), and marketing and distribution of newspapers, magazines, books, literary works, musical works, software and other works dealing with information, including the electronic media.* **In reality the only part of the publishing Plaintiff does is the printing. They did not represent this when selling the distributorship.**

5) **Plaintiff Sold Defendant a territory way too small to cover expenses under distributorship law:   Under distributorship law a territory sold has to be adequate to cover expenses.  The territory sold to defendant by Travelhost was only 4,000 rooms one of the smallest territories TRAVELHOST has ever sold. The average TRAVELHOST territory has 10,000-15,000 rooms 3-4 times the territory plaintiff sold defendant.**

9) **Travelhost offered no value, created "badwill" instead of goodwill with clients and had bad reputation among advertisers familiar with TRAVELHOST. The poor quality of layout, design, covers and printing made it impossible to keep customers and make a profit.  See addendums 4 emails from customers.**

6) **Travelhost used fake and implied successful people instead of real Associate Publishers in advertising and when implicating earning potential and promises of grandeur in print to induce people to buy distributorships. Travelhost also uses Ina Lee, the most successful Travelhost Associate Publisher, as their testimony in print and in video, instead of the typical Associate Publisher to induce investors to buy their business.**

See Advertisement example attached as addendum 5.

10)  Cost of producing goods went up immediately from contracted amount on purchase agreement (less than three months from purchase agreement date) upon purchasing distributorship.

11)  Fraudulent representation of regional and national advertisers.  Travelhost fraudulently sells for $30,000 the right to sell to regional and national advertisers thousands of dollars in regional and national ads which is grossly overstated and the ad revenue does not actually exist.

## Damages

Defendant hereby asks for damages from the above listed actions of Plaintiff to include but not be limited to:

Refund of initial money paid to TRAVELHOST in the amount of $30,000

Refund on poor publishing quality of five issues in the amount of $70,200.

Reimbursement of lost income defendant occurred after being fraudulently induced to purchase Travelhost up until now at the annual rate defendant made prior to purchasing Travelhost in the amount of $312,000.

*Tonya Tgg*   317-797-2022

*8103 E US Hwy 36, #266*

*July 22, 2011*

*Addendum #1*

### Indiana Secretary of State
### Securities Division Complaint Form

Online version available at: http://www.in.gov/sos/securities/sec_complaint.html

The Indiana Securities Division can investigate possible violations of these statutes:

◇Indiana Securities Act (IC 23-2-1)       ◇Indiana Loan Broker Act (IC 23-2-5)
◇Indiana Franchise Act (IC 23-2-2.5)      ◇Indiana Collection Agency Act (IC 25-11)
◇Indiana Takeover Offers Act (IC 23-2-3.1)

**I. Please select the subject matter that you feel best describes your complaint:**

☐ Securities/investments        ☐ Loan Broker        ☒ Franchise / *Business Opportunity*

☐ Collection Agency        ☐ Takeover Offers        *law 24-5-8*

**II. Please supply the following information about yourself:**

Name: *Tonya Figg*

Date of Birth: *12 / 11 / 65*

Address: *8109 E. US Hwy 36, #266, Avon, IN 46123*
　　　　　Street　　　　　　　　　　City/State　　　　　　　Zip Code

Email Address *tonya.figg@Live.com*

Home Phone #: (　　) 　　-　　　　　Cell Phone #: *(317) 797-2022*

**III. Please supply the following information about the person(s) and entities who you believe may have violated Indiana law:**

Company name: *Travelhost*

Address: *10701 Stemmons Frwy, Dallas, Texas 75220*

Phone number: *972-556-0541*

Website: _____

Individual(s) involved:
1) *James Berger, Owner*
Address: *Same as above*
Phone number: 

2) _____
Address: _____
Phone number: _____

Note: Please include any additional names in Section VI "Other Information".

IV. Please describe what happened (include relevant dates, names & locations, etc.):

See attached

V.  Do you have any records of the transaction? ☒ Yes  |  ☐ No

Please describe the documents you have:

_____All Purchase documents_____

_____

_____

VI.  Please provide any other information here:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Please mail the completed form, along with **copies** (no originals) of any supporting documentation, to the Indiana Securities Division:

Indiana Securities Division
302 W. Washington Street
Room E-111
Indianapolis, IN 46204

Page 2 of 3 Indiana Complaint

I would like for the state of Indiana to open an investigation into Travelhost, a Texas Corporation, selling business opportunities in the State of Indiana without registering and filing proper paperwork with the state of Indiana under code **24-5-8**
Chapter 8. Business Opportunity Transactions

Travelhost has many violations with the Indiana code and sold or transferred five businesses in the state of Indiana within a two year period including in Northwest Indiana, Lafayette/Muncie, Bloomington/Columbus, Evansville and Indianapolis. All of which are no longer doing business with Travelhost due to fraudulent claims and business practices.   Travelhost is also a know habitual offender of the FTC across the country as evidenced below under the FTC ruling.   Travelhost specifically violated the following codes in Indiana highlighted in red:

**Information Maintained by the Office of Code Revision Indiana Legislative Services Agency**

**IC**                                                                                                                                    **24-5-8**
Chapter 8. Business Opportunity Transactions

**IC**                                                                                                                                    **24-5-8-1**
**Definitions**
        Sec.        1.        As        used        in        this        chapter:
"Business        opportunity"        means        an        investment        that:
    (1) involves the sale or lease or offer to sell or lease any goods or services to an investor that    are    to    be    used    by    the    investor    in    beginning    or    operating    a    business;
    (2) involves an initial payment by the investor of more than five hundred dollars ($500) and an    initial    cash    payment    of    less    than    fifty    thousand    dollars    ($50,000);    and
    (3) involves    a    solicitation    of    investors    in    which    the    seller    represents    that:
        (A) the investor may or will earn an amount in excess of the initial payment as a result of the                                                                                                            investment;
        (B) a market exists for any goods to be made or services to be rendered by the investor;
        (C) the seller may buy from the investor any goods to be made or services to be rendered by                                                                            the                                                                            investor;
        (D) the seller or a person referred by the seller to the investor may or will sell, lease, or distribute    the    goods    made    or    services    rendered    by    the    investor;    or
        (E) the seller may or will pay to the investor the difference between the initial payment and        the        investor's        earnings        from        the        investment.
"Business        opportunity"        does        not        include        an        investment        that        involves:
    (1)    the    sale    of    a    franchise    as    defined    by    IC 23-2-2.5-1    or    IC 23-2-2.7-5;
    (2) the sale of any assets (other than inventory) of an ongoing business by the owner of the business;

price of five hundred dollars ($500) or less; or
  (4) the sale of all or substantially all of the assets of an ongoing business.
"Contract" means any agreement relating to a business opportunity.
"Goods" means any merchandise, equipment, product, supply, or material.
"Initial cash payment" means that portion of the initial payment that the investor is obligated to pay to the seller before or at the time of delivery of goods or services. The term does not include any amount financed by the seller, any amount for which financing is to be obtained by the seller, any amount that the seller assists in financing, or any amount required by the seller to be deposited as security for the performance by an investor of the operation of the business or that secures an extension of credit.


"Initial payment" means the total amount an investor is obligated to pay under the terms of the contract before or at the time of delivery of the goods or services to the investor or within six (6) months of the date that the investor commences operation of the business. If the contract states a total price for the business opportunity and provides that the total price is to be paid partially as an initial cash payment and the remainder in specific monthly payments, the term means the total price. The term does not include any amount required by the seller to be deposited as security for the performance by an investor of the operation of the business or that secures an extension of credit.
"Investor" means a person who is solicited to become obligated or does become obligated on a contract.
"Offer" includes every attempt to dispose of a business opportunity or an interest in a business opportunity for value.
"Person" means a human being, corporation, limited liability company, partnership, unincorporated association, trust, or governmental entity.
"Sale" includes every contract to sell or dispose of a business opportunity or an interest in a business opportunity for value.
"Seller" means a person, or his agent, who sells or leases or offers to sell or lease a business opportunity.
"Service" means any assistance, guidance, direction, work, labor, or such other act as may be provided by the seller in the initiation or maintenance of a business.
"Substantial seller" means a seller who has a net worth on a consolidated basis, according to current financial statements certified by an independent certified public accountant, of:
  (1) at least five million dollars ($5,000,000); or
  (2) at least one million dollars ($1,000,000) if the seller is at least eighty percent (80%) owned by a corporation that has a net worth on a consolidated basis, according to current financial statements certified by an independent certified public accountant, of at least five million dollars ($5,000,000).
*As added by P.L.134-1984, SEC.1. Amended by P.L.239-1985, SEC.2; P.L.12-1986, SEC.10; P.L.252-1987, SEC.1; P.L.8-1993, SEC.361.*

**IC**                                                                         **24-5-8-1.5**
**Substantial        sellers;        application        of        certain        sections**
    Sec. 1.5. Sections 2, 3, 4, 13, 15, and 19 of this chapter do not apply to a substantial seller.
*As added by P.L.252-1987, SEC.2.*





**IC**
**Contracts;**

24-5-8-6
**contents**

Sec. 6. (a) The seller shall put every contract in writing and shall give the investor a copy of

the contract at the time the investor signs the contract.
   (b) The seller shall include in every contract the following:
   (1) The seller's business address and the name and business address of the seller's agent in this state authorized to receive service of process.
   (2) The terms and conditions of payment.
   (3) A detailed description of any services that the seller undertakes to perform for the investor.
   (4) A detailed description of any training that the seller undertakes to provide to the investor.
   (5) The approximate delivery date of any goods the seller is to deliver to the investor.
   (6) A statement of the investor's right to cancel that must:
      (A) appear under the conspicuous caption, "INVESTOR'S RIGHT TO CANCEL WITHIN 30 DAYS"; and
      (B) contain the following statement in no smaller type than the body portion of the contract: "THE INVESTOR IN THIS BUSINESS OPPORTUNITY HAS THE RIGHT TO CANCEL THIS CONTRACT FOR ANY REASON AT ANY TIME BEFORE MIDNIGHT OF THE 30TH CALENDAR DAY AFTER THIS CONTRACT IS ENTERED INTO. YOU MAY CANCEL THIS CONTRACT BY MAILING A NOTICE THAT YOU DO NOT WANT THE BUSINESS OPPORTUNITY TO THE SELLER BEFORE _____, 20__ AT 12:00 MIDNIGHT AT _____.".
   (c) Subsection (b)(6) does not apply to a contract entered into by a substantial seller, unless required by the consumer protection division of the office of the attorney general for good cause shown

after                                                                                                        notice.
*As added by P.L.134-1984, SEC.1. Amended by P.L.252-1987, SEC.4; P.L.2-2005, SEC.62.*

**IC**                                                                                                      **24-5-8-7**
**Books,          records,          and          accounts;          documents**
   Sec. 7. (a) Every seller shall keep and maintain a complete set of books, records, and accounts of business opportunity transactions made by the seller.
   (b) The seller shall keep all documents relating to each contract entered into by the seller for four (4) years after the date of the contract.
*As added by P.L.134-1984, SEC.1.*

**IC**                                                                                                      **24-5-8-8**
**Validity     of     waiver     of     provisions     by     investor**
   Sec. 8. Any waiver by an investor of the provisions of this chapter is deemed contrary to public policy and is void and unenforceable.
*As added by P.L.134-1984, SEC.1.*

**IC**                                                                                                      **24-5-8-9**
**Attempts          to          have          investor          waive          rights**
   Sec. 9. A seller may not attempt to have an investor waive rights given to the investor by this chapter.
*As added by P.L.134-1984, SEC.1.*

IC                                                                              24-5-8-10
**Cutting    off    right    or    defense    of    investor    against    seller**
    Sec. 10. A seller may not require the investor to execute any note that will cut off a right or defense that the investor or a third party may have against the seller.
*As added by P.L.134-1984, SEC.1.*

IC                                                                              24-5-8-11
**Initial                         cash                         payment**
    Sec. 11. A seller may not require an initial cash payment that exceeds twenty percent (20%) of the initial payment.
*As added by P.L.134-1984, SEC.1.*

IC                                                                              24-5-8-12
**Escrow                                                         accounts**
    Sec. 12. A seller may not require a payment before the delivery of any goods that exceeds twenty percent (20%) of the initial payment unless the amount in excess of the twenty percent (20%) payment is placed in an escrow account which provides that the money can not be released                                                                 until:
    (1) the investor notifies the escrow agent in writing of the receipt of the goods; or
    (2) the seller presents to the escrow agent a bill of lading that proves shipment of the goods as required by the contract.


Notification of receipt by the investor to the escrow agent may not be unreasonably withheld.
*As added by P.L.134-1984, SEC.1.*

IC                                                                              24-5-8-13
**Reference    to    compliance    with    chapter    in    advertisement**
    Sec. 13. A seller may not make any reference to its compliance with this chapter in any advertisement or other contact with an investor other than by setting forth the registration number as provided in section 4 of this chapter.
*As added by P.L.134-1984, SEC.1.*

IC                                                                              24-5-8-14
**Use    of    commercial    symbols**
    Sec. 14. A seller may not use the trademark, service mark, trade name, logotype, advertising, or other commercial symbol of any business that does not either control the ownership interest in the seller or accept responsibility for all representations made by the seller in regard to the business opportunity, unless it is clear from the circumstances that the owner of the commercial symbol is not involved in the business opportunity.
*As added by P.L.134-1984, SEC.1.*

**IC**             **24-5-8-16**
**Voiding**             **contracts**

Sec. 16. (a) If a seller:
(1) uses any untrue, misleading, or deceptive statements in a business opportunity transaction;

(2) fails to deliver the goods or services necessary to begin substantial operation of the business within forty-five (45) days of the delivery date stated in the contract; or

(3) fails to comply with section 6 of this chapter;
the investor may void the contract within one (1) year of the date of the contract by giving written notice to the seller and is entitled to a return from the seller of all consideration paid to the seller.

(b) Upon receipt by the investor of the consideration paid to the seller, the investor shall make available to the seller, at a reasonable time and place, the goods received by the investor. However, the investor is not entitled to unjust enrichment by exercising the rights provided by this section.
*As added by P.L.134-1984, SEC.1.*

**IC 24-5-8-17**

**Recovery of actual damages for seller's failure to comply with chapter or breach of contract**

Sec. 17. Notwithstanding any other section of this chapter, a person who is damaged by a seller's failure to comply with this chapter or by a seller's breach of a contract may:
(1) bring an action for recovery of his actual damage including attorney fees; and

(2) bring an action against the bond required by section 3 of this chapter;
to recover an amount equal to his actual damages. However, the liability of the seller under this section may not exceed the amount of the bond.
*As added by P.L.134-1984, SEC.1.*

**IC**             **24-5-8-18**
**Injunction**

Sec. 18. Upon complaint by any person that a seller has failed to comply with this chapter, the circuit or superior court of the county of residence of the complainant may enjoin the seller from further violations.
*As added by P.L.134-1984, SEC.1.*

**IC**             **24-5-8-19**
**Failure to comply; Class D felony**

Sec. 19. A person who fails to comply with section 4 of this chapter commits a Class D felony.
*As added by P.L.134-1984, SEC.1.*

**IC**                                                                                                   **24-5-8-20**
**Failure            to            comply;            deceptive            act**
   Sec. 20. A person who fails to comply with any provision of this chapter commits a deceptive act that is actionable by the attorney general under IC 24-5-0.5-4(c) and is subject to the penalties                    enumerated                    in                    IC 24-5-0.5.
*As added by P.L.134-1984, SEC.1.*


**IC**                                                                                                   **24-5-8-21**
**Construction**
   Sec. 21. Nothing in this chapter shall be construed as relieving a person from complying with IC 23-2-2.5,                    IC 23-2-2.7,                    and                    IC 23-19.
*As added by P.L.134-1984, SEC.1. Amended by P.L.27-2007, SEC.24.*

# Dealerships and Distributorships – Beware the Franchise Minefield

by Leonard D. Vines[1]

Franchise laws embrace a wide variety of business distribution arrangements including many relationships that are not traditionally viewed as franchises. Even sophisticated parties often overlook their applicability and can suffer dire consequences as a result. The name given to the relationship is not controlling, and the protections afforded by the state and federal franchise laws cannot be waived. Business attorneys should be aware of the elements of a franchise under the franchise laws so they can structure the business relationship accordingly.

*"Legal terms often have specialized meanings that can surprise even a sophisticated party. The term 'franchise,' or its derivative 'franchisee', is one of those words."[2]*

Manufacturers and suppliers are all too often surprised and dismayed to learn that their distributorship relationships are subject to the franchise laws. A striking example is a recent case in which a jury awarded $1.525 million to a terminated Mitsubishi forklift distributor due to a violation of the Illinois franchise law. In affirming, the Court of Appeals poignantly noted:

Like many manufacturers, MCFA (Mitsubishi) simply did not appreciate how vigorously Illinois law protects "franchisees." . . . While we understand MCFA's concern that dealerships in Illinois are too easily categorized as statutory franchisees, that is a concern appropriately raised to either the Illinois legislature or Illinois Attorney General, not to this court. [3]

Likewise, attorneys representing manufacturers and suppliers, as well as those representing a terminated or disgruntled distributor, do their clients a grave disservice if they fail to recognize the applicability of the franchise or related laws.[4] For example, in *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin,*[5] attorneys representing a marketer of health and fitness business opportunities were sued for malpractice for failing to advise a client that it was subject to the Connecticut business opportunity law. In *Pyramid Controls Inc. v. Siemens Indus. Automation, Inc.,*[6] an attorney missed the statute of limitations for a terminated dealer because the attorney failed to recognize that the relationship was protected under the Illinois franchise law. In that case, the Seventh Circuit rejected plaintiff's argument that "only the plaintiff's actual knowledge can trigger the statute of limitations because the Franchise Act is so complicated and obscure very few attorneys understand how it works or even know of its existence."[7]

Indeed, few lawyers comprehend the breadth and scope of the franchise laws, and many fail to understand that the franchise laws, along with related laws, govern business relationships that may be vastly different from what is typically thought of as a franchise.[8]

## What is a Franchise?

Unfortunately, there is no universal definition of what constitutes a franchise. Definitions and interpretations under both federal and state law may be applicable, depending on the situation.

*Federal Law.* The Federal Trade Commission Act, in a promulgation known as the "FTC Rule,"[9] defines a franchise as a "continuing commercial relationship" that contains the following three elements:

1. *Trademark.* The franchisee is allowed to offer, sell or distribute goods, commodities, or services that are identified by a trademark, service mark, trade name, advertising or other commercial symbol;
2. *Significant control or assistance.* The franchisor exerts significant control or assistance over the franchisee's method of operation; and
3. *Fee or Payment.* The franchisee is required to pay a fee to the franchisor of $500 or more at any time (other than for bona fide wholesale prices for inventory) before or within six months after commencing operations of the business.[10]

*State Laws.* Although definitions employed by the states often resemble those set forth in the FTC rule insofar as state definitions usually involve a trademark element, a marketing element and a payment element, state laws may be narrower or broader than the FTC rule and often extend to forms of business relationships that embrace a wide variety of dealerships, distributorships, and licensing arrangements. Under most state laws the essential statutory definition for a *franchise* falls within one of two categories:

(1) *Marketing Plan.* The franchisor grants the franchisee the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by the franchisor; the business operated is substantially associated with the franchisor's trademarks, trade name, or commercial symbols; and the franchisee must pay a direct or indirect fee. The marketing plan element is often satisfied if the franchisor provides the franchisee with advice regarding business operations and sales of the franchisor's product or service.

(2) *Community of Interest.* The franchisor grants the franchisee the right to engage in the business of offering or distributing goods or services using the franchisor's trade name or marks, the parties share a community of interest in the marketing of the goods or services, and the franchisee pays a fee. The community of interest element is often satisfied when there is a continuing financial interest between the parties in the operation of the franchisee's business or the sale of the franchisor's products.[11]

**Laws Governing Franchises**

If the statutory definitional elements of a franchise are satisfied, the name attached to the relationship by the parties is irrelevant. The protections afforded by the laws generally cannot be waived, and the benefits of the applicable statute will control, despite contractual language to the contrary.

Once a business relationship falls within the statutory definition of a franchise, a variety of laws and regulations come into play. While a number of these franchise or related laws have their own particular nuances, they generally cover the following areas:

*Franchise pre-sale disclosure requirements and registration.* If a relationship meets the definition of a franchise under the FTC rule, the franchisor is required to provide a comprehensive pre-sale document (often referred to as an ████████████████████████ ████████ ████████████████████████████████████ ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ California, Hawaii, Illinois ████████, Maryland, Michigan, Minnesota, New York, North Dakota, Oregon, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin. In addition, the following states – while not technically considered franchise registration states – also require a filing with a state agency in order to obtain an exemption under the state's business opportunity law: Florida, Kentucky, Nebraska, North Carolina, Texas, and Utah.

*Special Industry Laws.* A wide variety of special industries are subject to specific state statutes that govern the relationship between the manufacturer or supplier and the distributor or dealer. The laws offer varying degrees of statutory protection. Common types of distribution arrangements subject to special protections include: liquor, motor vehicle, farm equipment, petroleum, and outdoor power equipment dealerships.

*Relationship Laws.* If a business relationship meets the definition of a franchise under a particular state law, many of the substantive aspects of the business relationship (i.e., termination, transfer, cancellation, and non-renewal) will be governed by that state law. The FTC rule does not regulate the relationship between the franchisor and franchisee after the franchise is purchased. State laws are, however, designed to protect franchisees from being terminated without good cause and to, varying degrees, from being treated unfairly. Each state law is different, so it is important to examine the applicable statute. States that have enacted relationship laws are Arkansas, California, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, South Dakota, Virginia, Washington, Wisconsin.

Not all laws apply to each situation. For example, a relationship may be subject to laws governing termination, even if it is not subject to federal disclosure requirements. However, a relationship which is a franchise under the FTC rule will most likely be subject to a state's relationship laws.

Many state franchise laws, as well as the FTC rule, contain several exclusions and exemptions; however, the exclusions and exemptions are by no means uniform. Among those relationships exempt from coverage under the FTC rule are the fractional franchise,[13] employer-employee relationships, and general partnerships. State exemptions vary widely. An exemption available under the FTC rule may not be sufficient to exempt a relationship from coverage under a state law.

## Business Opportunity Laws

Dealers and distributors, particularly those who attempt to structure the relationship in an effort to avoid the application of the franchise law, must pay particular attention to business opportunity laws. The FTC rule defines a business opportunity as a relationship in which: (a) the

investor sells goods or services supplied by the seller or its affiliate, or by suppliers with which the seller requires the investor to do business; (b) the seller secures retail outlets or accounts for the goods or services, or secures locations for vending racks or machines, or provides the services of someone who can perform either of these functions; and (c) the investor must make a required payment to the seller or its affiliate of $500 or more from any time before to within six months after commencing operations in order to obtain or commence the venture.[14]

State business opportunity laws generally cover a much broader range of business arrangements than those covered by the FTC rule. These laws literally apply to franchises; however, in most cases, there is an exemption or exclusion available to a franchise if it is associated with a trademark or tradename or if the franchise is subject to the FTC rule. The following states have enacted business opportunity laws: Alabama, California, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, North Carolina, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and Washington.

**Examples of "Hidden" Franchises**

The wide array of cases and administrative opinions interpreting whether or not the statutory definition of a franchise is present demonstrates that there are many hidden franchises. The following cases provide just a few examples of the wide grasp of the franchise laws and their applicability to distributorship and other similar arrangements. To the untrained eye, many of these situations do not appear to involve a franchise. They have been variously referred to as hidden, inadvertent, or unintended franchises.



**Risks of Non-Compliance**

Failure to comply with franchise registration or relationship laws exposes the violator to substantial risks of civil and criminal liability. Although "there is no private right of action" for failure to comply with the FTC rule,[33] the Federal Trade Commission has enforcement powers to subject the non-complying party and its officers and directors to injunctions, cease and desist orders, rescission, civil fines, and criminal penalties. Private causes of action are, however, available under many state laws. Those who fail to register or provide required disclosures in the so-called "registration states" are subject to various civil remedies, such as damages, rescission, and attorney's fees, and, in most cases, criminal liability. Furthermore, some states that do not require franchisors to register have enacted *Little FTC Acts* that provide that a violation of the FTC rule is actionable under state law. The FTC rule imposes liability on officers and directors if

there is a violation, and most state laws extend joint and several liability to officers and directors and those participating in the violation as well.

Franchisors who fail to follow the mandates of state relationship laws, particularly those governing termination or failure to renew, are subject to injunctive relief and significant damages for wrongful termination. For example, in *Globe Distributors v. Adolph Coors Co.,*[34] a New Hampshire beer manufacturer relied on the language in the distributorship agreement, which allowed for termination for nonpayment without any demand or notice, to its peril. Its distributor was awarded double damages of more than $10.2 million, plus attorney's fees, because the brewer failed to comply with the state statute requiring the brewer to give written notice of an intent to terminate and an opportunity to cure the claimed deficiency.

**BESTFRANCHISES ™**

Today's Best Franchises™ offers franchise opportunity information. We provide top franchise information to buyers and valuable franchise consulting prior to buying a franchise Today! Learn More

Home | Best Franchises (A – Z) | Top Franchise Categories | Top Franchise Opportunities | Articles | Quick Submission | Contact Us | SiteMap

**Addendum #2**

## TravelHost

Email Opportunity to a Friend



**America's #1 Travel Magazine.**
**TRAVELHOST**

### The National Traveler's Guide for Places to Go and things to do!

**Drive your Career**
Many professionals today are discontent with the endless personnel transfers, management changes, downsizing or "right-sizing" of corporations. More importantly, modern managers want more control over their time and what they do – and they want a career that is meaningful and important.

**Take Charge**
Since you're considering your own business, you're in good company. The Department of Labor predicts that the #1 employer in 2010 will be "Self" – and a recent Internet poll of 25-44 year olds revealed that 90% of people like you hope to own their own business someday.

**TRAVELHOST - Right Time - Rock'n Opportunity**
Our network of over 125 Associate Publishers provide the vital local information all travelers need, and deliver high impact advertising at the point of decision making for their clients. TRAVELHOST is the premier in-room travel guide that hungry, curious travelers turn to when seeking places to eat, shop and entertain themselves in cities and resorts across the nation. This is your opportunity to invest in yourself with America's #1 travel magazine.

### Status, Prestige and Recognition
Last year alone, travelers in the U.S. spent $654 Billion* in local hotels, restaurants, museums, attractions and retail establishments. These opportunities are virtually brought to life by Associate Publishers in the pages of TRAVELHOST Magazine. Acting as "travel ambassadors" and business consultants in their local community, these professionals assist merchants in cultivating revenues from the captive audience of free spending travelers.

- A Nationally Recognized Brand - Industry Leader
- 40 Years of Operational Experience
- 100% Retention of Local Advertising Revenues – No Royalties
- Sell & Share in Regional and National Ad Revenues
- Centralized Graphics, Printing and Publishing
- Exclusive, Protected Publication Territories

**Investment Requirements - $30K - $60K**

"I was a single mother who had to support my two sons, ages 4 and 7 some twenty-five years ago. I was committed to finding a career that afforded me independence as well as financial rewards. TRAVELHOST magazine of Fort Lauderdale became the vehicle to fulfill my dreams beyond anything I could have imagined. I have made a major difference in my area and have received many honors and awards. Best of all, my time is my own and I have the freedom to pursue that which is important to me."
- Ina Lee - TRAVELHOST Associate Publisher - 25 years

**Be your own Boss - No Publishing Experience Necessary**
Learn more about the opportunity that simply makes good sense.

**To learn more about the TravelHost franchise opportunity, simply complete the form below.**

### Franchise Categories
*All of Today's Best Franchises
*Master Franchises
Automotive Franchise
Business Coaching Franchise
Carpet Cleaning Franchise
Children's Franchise
Cleaning Franchise
Coffee & Cafe Franchise
Consulting Franchise
Education Franchise
Financial Services Franchise
Fitness Franchise
Floral Franchise
Food Franchise
Franchise Funding
Healthcare & Beauty Franchise
Home Based Franchise
Home Decor Franchise
Home Improvement Franchise
Internet Franchise
Junk Removal Franchise
Maintenance Franchise
Pet Franchise
Printing Franchise
Retail Franchise
Services Business Franchise
Shipping Franchise
Tax Franchise
Tech Franchise
Telecom Franchise
Training Franchises
Video Franchise

### Best Franchises (A – Z)
...> 1-800-DryClean
...> 1-800-FLOWERS
...> AAMCO
...> Budget Blinds
...> Chem-Dry
...> Heavens Best
...> KnowledgePoints
...> Lease One
...> MatchPoint
...> Mathnasium
...> PosiGrip
...> PostNet
...> Tax Centers of America
...> Tutor Doctor
...> WSI Internet
MORE >>

### Top Franchise Opportunities











Addendum
3

# TRAVELHOST
## QUALITY CONTROL FORM

☐ Administration
☐ Marketing
☐ Communications

Date Submitted __11/20/08__ Time Submitted _____ QC Number __1671__

Market Name __Bloomington__ Issue Date __10-12-08__

TO:  Team Leader Name __Tamara Rose / Stephanie Hart__

Team Leader Phone: (972) 556-0541    Team Leader Fax: (972) 556-0787

FROM:  AP's Name __Tonya Figg__

AP Phone __317 797 2022__    AP Fax __317-718-1130__

AP Concern: (Give page number, or form number, if applicable, and attach copy)

I have had several complaints from customers about the quality of printing specifically colors + photos look "washed ou some competing publications with sam ads + photos hav

AP Signature __Tonya Figg__

---

**TRAVELHOST**

Date Received _____  Date Responded _____

Time Received _____  Time Responded _____

Department _____  Associate _____  Team Leader _____

Corrective Action _____

_See attached_

Team Leader Signature _____  Date __12-3-08__

Multimedia Manager _____  Date __12-3-08__

VP of Communications Signature _____  Date _____

CFO Signature _____  Date _____

* Instructions to AP: Use this form to send concerns regarding your latest issue. Type or print with black ink. Fax or send this electronically to your Team Leader with a copy of tearsheet showing concern circled in black marker. Team Leader will verify the form is received within 48 hours. AP is still responsible for submitting necessary corrections in next Production Packet.

**Bloomington, 10-12-08 issue**

We are in receipt of your quality control fax and other publication samples regarding your color concerns. Our research has revealed that the required color proofs that were provided were laser copies and not printed samples as you have now provided. TRAVELHOST prints on heat set web presses and accordingly our guidelines request to account for a 25% press gain, meaning items will print darker than they appear on a computer screen. Having this in mind, and with the only available comparison being the provided lasers, which are significantly lighter than the digital files, the associate building these pages made slight adjustments to brighten these items.

Although we were not using the lasers in the same fashion as if it were a professional four color match proof, again it was the only sample provided for the photos on pages 30 and 31. Regarding the JL Waters ad on page 45, there was actually no sample provided at all so a color match expectation was not possible.

In the future when clients have color expectations and printed samples are available, please provide those in the production packet. Keeping in mind our production manual states 'TRAVELHOST produces a pleasing color publication and does not guarantee an exact color match', your team can use the sample when performing press checks to "attempt" to match the sample as closely as possible.

**Addendum 4 (a)**

**From:** Henry, Heather [mailto:hhenry@frenchlick.com]
**Sent:** Friday, November 06, 2009 2:24 PM
**To:** 'Tonya Figg'
**Subject:** RE: 2010

Hello Tonya,

I received the copies you brought by last week, thank you. At this time I am going to decline a meeting knowing managements thoughts on the publication.  As much as I would love to sit down with you there are some things that have not changed with regards to advertising in Travelhost magazine. You are more than welcome to send over a proposal and I will send it along for consideration.  I wish you much success in 2010.

Sincerely,

Heather Henry
Media Planner/Buyer
French Lick Resort
501 S. Madison, Suite 103
Bloomington, IN  47403
P: 812-330-5424
F: 812-330-5422

Addendum 4 (b)

-----Original Message-----
From: Kim Getman [mailto:kgetman@mediaworksonline.com]
Sent: Monday, August 24, 2009 3:34 PM
To: 'Tonya Figg'
Subject: RE: Trojan Horse

Hello Tonya,

After careful consideration and much discussion, we've decided to pass this
year.

We've learned over the years that we receive a fairly small amount of
patrons from hotel traffic. Those travelers seem to prefer chains (as they
know what to expect) and those few hotels that are in walking distance from
the square, we reach through other media. Those factors plus the combination
of the % of ads to editorial content and the new "three cover" within one
magazine approach has confirmed our decision. I would be happy to discuss
with you over the phone if you would like a more detailed explanation.

Thank you for your professionalism. Our decision has absolutely nothing to
do with your servicing of the account.

Regards,
Kim

- - - - - - - - -
Kim Getman
Client Services Director

Mediaworks
117 E. 6th Street
Bloomington, IN 47408
812.333.8099 ext.14
812.333.8158 fax
www.mediaworksonline.com

# change...

*Addendum 5*



The female head of household - single or not - who wants to finally get into the driver's seat of her own future and for whom she is responsible. She's the woman whose passion and dream has little or no time and even less patience for those patronizing glass ceilings or agonizingly long career waits and empty promises.



The couple who finally begin to realize what all their friends have known all along - that they have an incredible chemistry together. They click. Always have and always will, no matter what. What a natural partnership for being in the business for themselves - as a team.



The road warrior who's as comfortable in catching three planes next Thursday alone without missing a single text message or email as they are making every sales projection that has ever been thrown at them. These ambassadors of the asphalt achieve their goals whether they are in business for themselves or not - but realize life on the road leaves no time for home and family.



The world conqueror who just wants to return home. They've gone to the big city - conquered it - sat on the top rung of the ladder and had it all - but for someone else. Now they want to downsize and be on their own - with only two simple rules: 1. They want to wake up and hear a Mockingbird or Robin chirp outside their window and 2. They want to own a fun business they can build - be the big fish in the little pond - one that will let them climb the ladder as high as they'd like - right in or right near their own hometown.

**TRAVELHOST** has had a very simple business model for more than 40 years. We look to select entrepreneurs to become our local Associate Publishers & Distributors in cities all throughout North America — entrepreneurs who have the drive and passion to succeed in a business they are totally committed to and enjoy.

**If you have the passion and goal to get in control of your own future - Call (800) 527-1782 or email info@travelhost.com now for more information.**



Do not ship liquids, blood or diagnostics in this packaging.

MON – 25 JUL A1
STANDARD OVERNIGHT
75242
TX-US DFW

FedEx
TRK# 8758 1287 9983

XH RBDA

FedEx Express
US Airbill

1 From
Date 7/22
Sender's Name Tonya Figg   Phone 317 797-2022
Company
Address 8103 E US Hwy 36, #306
City Avon   State IN   ZIP 46123

2 Your Internal Billing Reference

3 To
Recipient's Name US District Ct   Phone 214 753 2200
Company Northern District of Texas
Address 100 Commerce St 149
City Dallas   State TX   ZIP 75246

RECEIVED
JUL 2 5 2011
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

fedex.com 1.800.GoFedEx 1.800.463.3339